## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| C.R. BARD, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 07-1895 (GEB) (MCA) |
| v. | : | |
| | : | CONTAINS CONFIDENTIAL |
| LIBERTY MUTUAL INSURANCE COMPANY, | : | MATERIAL – SUBJECT TO |
| Defendant. | : | MOTION TO SEAL UNDER L.CIV.R. |
| | : | 5.3(c) |

| | | |
|---|---|---|
| C.R. BARD INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 2:07-2547 (GEB) (MCA) |
| | : | |
| v. | : | |
| | : | |
| LEXINGTON INSURANCE CO. and | : | CONSOLIDATED CASES |
| AMERICAN INTERNATIONAL SPECIALTY | : | |
| LINES INSURANCE CO., | : | Motion Returnable:  September 7, 2010 |
| | : | |
| Defendants. | : | ORAL ARGUMENT REQUESTED |
| | : | |

---

## BRIEF OF LIBERTY MUTUAL INSURANCE COMPANY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BASED UPON PRIOR PUBLICATION EXCLUSION

---

John C. Sullivan
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Phone:  (215) 587-1487
Fax:  (215) 587-1444
E-mail:  jsullivan@postschell.com
Attorneys for Defendant
Liberty Mutual Insurance Company

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................1

II.   STATEMENT OF FACTS ..........................................................................4

    A.    THE POLICIES ................................................................................4

        1.    Defense Cost Provisions ........................................................4

    B.    THE UNDERLYING LITIGATION.................................................7

        1.    The *Rochester* Pleadings.........................................................7

        2.    The *St. Francis* Pleadings ......................................................8

    C.    THE *MEDMARC COVERAGE* ACTION ...........................................10

    D.    BARD'S CONDUCT PRIOR TO APRIL 1, 2003 .................................11

III.  ARGUMENT..............................................................................................22

    A.    SUMMARY JUDGMENT STANDARD ..............................................22

    B.    THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT
        THAT LIBERTY MUTUAL HAS NO DUTY TO REIMBURSE BARD
        FOR THE COSTS OF DEFENDING AND SETTLING THE *ROCHESTER*
        ACTION OR FOR THE COSTS OF DEFENDING THE *ST. FRANCIS*
        ACTION ..........................................................................................22

    C.    UNDER PRINCIPLES OF JUDICIAL ESTOPPEL, BARD CANNOT SEEK
        COVERAGE FROM LIBERTY MUTUAL ........................................28

IV.   CONCLUSION...........................................................................................29

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................22

*Applied Bolting Tech. Prods. v. U.S. Fid. & Guar. Co.*, 942 F. Supp. 1029 (E.D. Pa. 1996),
    *aff'd*, 118 F.3d 1574 (3d Cir. 1997) ................................................................24

*Bahrle v. Exxon Corp.*, 279 N.J. Super. 5 (App. Div. 1995) .........................................28

*Chao v. Roy's Constr., Inc.*, 517 F.3d 180 (3d Cir. 2008) .............................................28

*Cummings v. Bahr*, 295 N. J. Super. 374 (App. Div. 1996) ...........................................28

*Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742 (3d Cir.1999) ........................23

*G.I. Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247 (3d Cir. 2009) ............................28

*Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976) ....................................22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................22

*New Jersey Eye Center, P.A. v. Princeton Ins. Co.*, 394 N.J. Super. 557 (App. Div.),
    *cert. denied*, 193 N.J. 275 (2007) ..........................................................................3

*Palcsesz v. Midland Mut. Life Ins. Co.*, 87 F. Supp. 2d 409 (D.N.J. 2000) .............................28, 29

*Ringler Associates Inc. v. Maryland Casualty Co.*, 96 Cal. Rptr. 2d 136 (Cal. Ct. App. 2000)....25

*SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188 (1992) .......................................3

*Tradesoft Techs., Inc. v. Franklin Mut. Ins. Co., Inc.*, 329 N.J. Super. 137
    (App. Div. 2000) ................................................................2, 22-23, 24-25

*Transp. Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 346 F. App'x 862 (3d Cir. 2009) .............2, 23, 24, 27

**RULES**

Federal Rule of Civil Procedure 56(c) ........................................................................22

REDACTED

Liberty Mutual Insurance Company ("Liberty Mutual") submits this brief in support of its motion for summary judgment. This is a declaratory judgment action in which C.R. Bard, Inc. ("Bard") seeks coverage under three consecutive annual Excess Commercial General Liability Policies issued by Liberty Mutual from April 1, 2003 to April 1, 2006 (the "Liberty Excess Policies") with respect to two antitrust suits against Bard. (Bard Complaint, Sullivan Dec., Ex. A) The first antitrust suit — *Rochester Medical Corp. v. C.R. Bard, Inc.*, No. 5:04-CV-060, filed in the Eastern District of Texas (the "*Rochester* Action") — was settled by Bard in December 2006 for          after it had incurred $17 million in defense costs. (Confidential Settlement Agreement and Release between C.R. Bard, Inc. and Rochester Medical Corporation, Declaration of John C. Sullivan, Esq. ("Sullivan Dec."), Ex. B and April 10, 2008 letter from Jeffrey M. Pollock, Esq. to William M. Savino, Esq., Sullivan Dec., Ex. C) The second antitrust suit — *St. Francis Medical Center, et al. v. C.R. Bard, Inc.*, No. 1:07-CV-00031, filed in the Eastern District of Missouri (the "*St. Francis* Action") — was appealed to the Eighth Circuit after Bard obtained summary judgment in its favor. For the reasons stated below, Liberty Mutual is entitled to summary judgment that it has no obligation to reimburse Bard for the amounts it spent to defend and settle the *Rochester* Action or to defend the *St. Francis* Action based on the prior publication exclusion in the Liberty Mutual Excess Policies.

## I.    INTRODUCTION

Antitrust claims are not covered under the Liberty Excess Policies. Bard claims that it is nonetheless entitled to coverage on the grounds that the antitrust suits included disparagement claims. As demonstrated below, there is no genuine issue of material fact that the alleged disparagement at issue began many years before April 1, 2003, the date in which Liberty Mutual

first insured Bard.  Because the Liberty Excess Policies exclude coverage for "'Advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period...." there is no coverage for the disparagement claims. Under New Jersey law, "[i]f [the insurer] can demonstrate the offending publications first took place prior to the effective date of the policy, it will be entitled to the grant of its motion for summary judgment." *Tradesoft Techs., Inc. v. Franklin Mut. Ins. Co., Inc.*, 329 N.J. Super. 137, 148-49 (App. Div. 2000).  This exclusion applies even if Bard claims that its disparagement campaign continued after April 1, 2003.  This is because "[u]nless later publications contained 'new matter' — i.e. substantively different content — that the underling complaint 'allege[d] [were] fresh wrongs,' the 'prior publication' exclusion applies." *Transp. Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 346 F. App'x 862, 867 (3d Cir. 2009) (citation omitted) ("*Transportation v. PMA*").

In fact, in a separate declaratory action captioned *Medmarc Casualty Insurance Co. v. C.R. Bard, Inc.*, Dkt. No. UNN-L-2435-05 (the "*Medmarc Coverage* Action"), Bard claimed that Medmarc Casualty Insurance Company ("Medmarc"), which insured Bard from January 1, 1997 to April 1, 2003 — *i.e.*, the six years preceding the Liberty Excess Policies, — owed coverage for the *Rochester* and *St. Francis* Actions.  The Medmarc policies provided coverage for personal injury and advertising injury "*only* if the offense" — *i.e.*, the publication of material that disparaged Rochester — "was committed ... *during the policy period*." (Medmarc Policy, Sullivan Dec., Ex. D) (emphasis added)  Bard not only sued Medmarc, it obtained summary judgment that Medmarc was required to defend Bard with respect to both the *Rochester* and *St. Francis* Actions.  (Order of March 17, 2008 granting Bard's Motion for Partial Summary

REDACTED

Judgment in the *Medmarc Coverage* Action, Sullivan Dec., Ex. E); Order of April 7, 2008, filed

in the *Medmarc Coverage* Action, Sullivan Dec., Ex. F)

    As a result of the summary judgment ruling with respect to the *Rochester* Action, Bard

asserted that Medmarc owed it $15.5 million of the $17 million it spent defending the *Rochester*

Action. (April 10, 2008 letter from Jeffrey M. Pollock, Esq. to William M. Savino, Esq. at p.7,

Sullivan Dec., Ex. C)  Bard ultimately settled with Medmarc for                (Confidential

Settlement Agreement and Mutual Release in *Medmarc Coverage* Action, Sullivan Dec., Ex. G)

Having already obtained a ruling that another insurer was obligated to defend because the

*Rochester* and *St. Francis* Actions were based on alleged disparagement that occurred *before*

April 1, 2003, Bard cannot sue Liberty Mutual claiming that the first publication took place *after*

April 1, 2003.[1]

---

[1] Although this motion would be dispositive if granted, Liberty Mutual explicitly reserves its
right to assert and argue all other defenses available to it. Without limiting the foregoing, the Liberty
Excess Policies state that Bard will not, except at its own cost, make or accept any settlement without
Liberty Mutual's prior written consent. They also provide that "[i]n the event the insured violates the
provisions of this paragraph, insurance provided under this policy . . . shall be void." (Liberty Mutual
Excess Policy, Sullivan Dec., Ex. H at LMI-CRB000083) Bard settled the Rochester Action without
Liberty Mutual's prior written consent. In New Jersey, when the insured negotiates a settlement without
the participation or consent of the insurer, courts do "not find it necessary to even consider" whether a
settlement was the "product of bad faith or collusion" or whether it was "reasonable in amount," "because
the purported  settlement represented such a fundamental breach of the insured's obligations to [the
insurer]." *New Jersey Eye Center, P.A. v. Princeton Ins. Co.*, 394 N.J. Super. 557, 570-71 (App. Div.),
cert. denied, 193 N.J. 275 (2007).
    Equally important, the allegations in the *Rochester* and *St. Francis* Actions focused principally on
Bard's alleged violation of federal and state antitrust laws, not disparagement. Under New Jersey law,
even "when the insurer has wrongfully refused to defend an action and is then required to reimburse the
insured for its defense costs, its duty to reimburse is limited to allegations covered under the policy,
provided that the defense costs can be apportioned between covered and non-covered claims." *SL Indus.,
Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 215-16 (1992).

3

## II.    STATEMENT OF FACTS

### A.    THE POLICIES

#### 1.    Defense Cost Provisions

As indicated by their title, the Liberty Excess Policies are excess policies, not primary policies. The policy provisions relevant to the issue of the obligation to pay defense costs — defined as "Allocated Loss Adjustment Expense" in the policies — are set out in three parts of the policy.[2] First, the COVERAGE – ADVERTISING OFFENSE Endorsement, Endorsement No. 6 to the policy, provides in relevant part as follows:

> 1.    Coverage
>
> ...
>
> c.    *We WILL NOT have the duty to defend or investigate any claim or "suit" seeking damages to which this endorsement may apply.* Rights and duties relating to the defense, settlement and investigation of claims or "suits" to which this endorsement may apply are set forth in SECTION II – DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND "SUITS".

(Liberty Mutual Excess Policy, Sullivan Dec., Ex. H at LMI-CRB 000075 – 76A) (emphasis added; original in capitals) Section II of the policies states, in relevant part, as follows:

> **SECTION II - DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND "SUITS"**
>
> Rights and duties relating to the defense, settlement and investigation of claims or "suits" to which this policy may apply (which shall be exercised in good faith) are as follows:
>
> (1)    *The insured has the duty to defend any "suit."*

(*Id.* at LMI-CRB 000082 – 84) (emphasis added)

---

[2] The Liberty Excess Policies are substantively identical. For the convenience of the Court and the parties, Liberty Mutual has cited the language contained in the policy in effect from April 1, 2003 to April 1, 2004.

4

Pursuant to an endorsement entitled "ALLOCATED LOSS ADJUSTMENT EXPENSE INCLUDED WITHIN SELF-INSURED AMOUNT AND LIMITS OF INSURANCE," Liberty Mutual agreed as follows:

> SECTION V SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE is deleted and replaced with the following:
>
> 1. Where the insured controls the defense, we will reimburse the insured for "Allocated Loss Adjustment Expense" incurred by the insured for any "occurrence" after the "Self Insured Amount" has been exhausted by the payment of damages and/or "Allocated Loss Adjustment Expense" by the insured for that "occurrence"....

(*Id.* at LMI-CRB 000099 – 101)

The policy provisions relevant to the issue of the obligation to pay for judgments and settlements for claims based on advertising injury are set out in the following parts of the policy. The Coverage provision in the COVERAGE – ADVERTISING OFFENSE Endorsement provides in relevant part:

> 1. Coverage
>
>    a. We will pay those sums in excess of the "Self-Insured Amount" that the insured becomes legally obligated to pay as damages because of "advertising injury" to which this endorsement applies.
>
>    The amount we will pay for damages is limited as described in item 5 of this endorsement.
>
>    b. This endorsement applies to "advertising injury" caused by an offense arising out of your business; but only if the offense was committed in the "coverage territory" ***during the policy period***.

(*Id.* at LMI-CRB 000075 – 76A) (emphasis added)  The term "advertising injury" is defined, in relevant part, as follows:

> "Advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

(1)    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services ...

(*Id.*) The advertising injury coverage is subject to the prior publication exclusion, which states:

4.    Exclusions

This insurance does not apply to:

b.    Material Published Prior to Policy Period

"Advertising injury" arising out of oral or written publication of *material whose first publication took place before the beginning of the policy period* (except for injury to which item 3. "Stop Gap" Coverage for Renewal Insureds Only applies).

(*Id.*) (emphasis added)[3]    The "Limits of Insurance" provision in the COVERAGE – ADVERTISING OFFENSE Endorsement states that the insurance provided is subject to a $4,950,000 limit in excess of a $50,000 Self-Insured Amount. (*Id.*) The General Aggregate Limit stated in the policy is also $4,950,000. (*Id.*) The "Explanatory Note On Limits Of Insurance" provision in the COVERAGE –ADVERTISING OFFENSE Endorsement states:

For the purpose of determining the Limits Of Insurance, the following is added to Section III – Limits Of Insurance:

All injury within subdivision b. and c. of the definition of "personal injury", and "advertising injury" arising out of a series of related acts or "covered offenses", including all repetitions or reproductions, will be considered as the result of one and the same "occurrence".

(*Id.*) Pursuant to the Limits of Insurance provision in the ALLOCATED LOSS ADJUSTMENT EXPENSE INCLUDED WITHIN SELF-INSURED AMOUNT AND LIMITS OF INSURANCE Endorsement:

2.    The General Aggregate Limit is the most we will pay for the sum of damages under Coverage A and Coverage B [i.e., advertising injury coverage] and "Allocated Loss Adjustment Expense"....

---

[3]    The Stop Gap provision has no applicability here. It addresses the situation in which advertising injury that is not "otherwise excluded" occurs during consecutive policies issued by Liberty Mutual. (Liberty Mutual Excess Policy, Sullivan Dec., Ex. H)

6

(*Id.* at LMI-CRB 000099 – 101)                                   REDACTED

### B.   THE UNDERLYING LITIGATION

#### 1.   The *Rochester* Pleadings

On March 16, 2004, Rochester filed its original complaint against Bard. (*Rochester*

Complaint, Sullivan Dec., Ex. I)  The principal focus of the complaint and amended complaint in

the *Rochester* Action was that Bard had engaged in anticompetitive conduct in violation of state

and federal antitrust statutes in connection with its sale of urological catheters.  Rochester

alleged that the primary means by which sales of urological catheters to hospitals occur is

through Group Purchasing Organizations ("GPOs").  (*Rochester* First Amended Complaint, ¶¶

20-22,27,37, Sullivan Dec., Ex. J)  By pooling the purchasing power of hundreds of hospitals,

GPOs seek to obtain better pricing in contracts with the manufacturers of medical devices than

hospitals could negotiate individually.  (*Id.*, ¶¶ 21-22)  Rochester characterized its claim as

follows:

(December 6, 2006 Joint Mediation Submission, Sullivan Dec.,

Ex. K)  Rochester alleged that Bard engaged in anti-competitive practices by entering into

exclusionary contracts with GPOs that substantially limited the ability of GPO hospital members to

purchase urological catheters from companies such as Rochester that did not have contracts with

GPOs. (*Id.*)

In addition, Rochester alleged that Bard had engaged in a "campaign of pervasive product

disparagement intended to mislead the public and purchasers of the Rochester Release-NF ®

Catheter into believing that the Rochester product was potentially harmful and ineffective."

(*Rochester* First Amended Complaint, ¶ 28, Sullivan Dec., Ex. J)  More specifically, Rochester

claimed that Bard intentionally misrepresented to the public and prospective purchasers that

nitrofurazone, the active agent in the Rochester product, "is an *antibiotic* when it is in fact a

*bactericidal*." (*Id.*) (emphasis in original)  Rochester further alleged that Bard had instructed Bard's sales personnel to misrepresent to customers that the Rochester product could foster the development of "super bugs" and to further misrepresent that the active agent in the Bard catheter was far less likely to cause acquired antibiotic resistance than the nitrofurazone used in the Rochester catheter.  (*Id.*)  Rochester identified two specific publications as evidence of the campaign:  (1) a letter dated April 16, 2002 from Bard's Medical Division Manager, Rob Hanson, to Fred Gordon at Catholic Health Services that "nitrofurazone ... is an antibiotic" and (2) an August 1998 article written by Harriette A. Carr, which refers to the Rochester product as "a catheter impregnated with the antibiotic nitrofurazone," states that the Rochester catheter may contribute to the further development of antibiotic resistant neuropathogens, and states that "silver (used by Bard) has been used extensively to prevent infections and resistance by microorganisms to silver is rare." (*Id.*, ¶ 28)

### 2.   The *St. Francis* Pleadings

On February 21, 2007, purchasers of urological catheters filed a class action complaint against Bard. (Southeast Missouri Hospital Complaint, Sullivan Dec., Ex. L)  The named plaintiff was Southeast Missouri Hospital; St. Francis Medical Center ("St. Francis") became an additional named plaintiff through the Second Amended Complaint.  (*St. Francis* Second Amended Complaint, Sullivan Dec., Ex. M)  Plaintiffs alleged that as a result of Bard's anticompetitive conduct with respect to Rochester, the members of the putative class "sustained losses and damage to their business and property in the form of overcharges for urological products." (*Id.*, ¶ 81)  The claims asserted in the *St. Francis* Action included allegations that Bard had "engag[ed] in a campaign of disparagement and misinformation" about the urological products manufactured by Rochester.  (*Id.*, ¶ 45)  The allegations in the *St. Francis* Action concerning this campaign of disparagement were taken nearly verbatim from paragraph 28 of the

REDACTED

Rochester Amended Complaint. (*Compare* St. Francis Amended Complaint, ¶ 46 *with* Rochester Amended Complaint, ¶ 28, Sullivan Dec., Exs. M and J)  In fact, in the *Medmarc Coverage Action*, Bard admitted that,

(Response Brief of Defendant C.R. Bard, Inc. in Opposition to Plaintiff's Motion for Partial Summary Judgment at 1, filed in the *Medmarc Coverage* Action, Sullivan Dec., Ex. N) (emphasis added)

On September 22, 2008, the Eastern District of Missouri ruled on the motion of Southeast Missouri Hospital and St. Francis to certify their claims as a class action.  (Order Dated September 22, 2008 in the *St. Francis* Action, Sullivan Dec., Ex. O)  The court ruled that only St. Francis could proceed as a class representative.  (*Id.* at 16.)  However, the court ruled that St. Francis could not proceed with disparagement claims because "St. Francis' representative, William Tegel, testified that Bard never did anything to disparage Rochester to St. Francis." (*Id.* at 9)  As a result, the court ruled:  "[W]ith St. Francis lacking standing to [sic] on the disparagement claims, those claims must either be dismissed or the action must be dismissed for lack of a named class representative." (*Id.*)  In response to these rulings, on October 6, 2008, St. Francis filed Amended Class Definitions and Stipulations, including the following:

> Finally, in accordance with the Court's decision, Order at 9-10, Plaintiff Saint Francis Medical Center dismisses its claims of product disparagement.

(Saint Francis Medical Center's Amended Class Definitions and Stipulations, ¶ 6, Sullivan Dec., Ex. P)

On September 28, 2009, the *St. Francis* Court granted Bard's motion for summary judgment. (Order Dated September 28, 2009 in *St. Francis* Action, Sullivan Dec., Ex. _Q  The

REDACTED

case is currently on appeal to the Eighth Circuit. (St. Francis Notice of Appeal, Sullivan Dec.,

Ex. R)

### C.   THE *MEDMARC COVERAGE* ACTION

In July 2005, Medmarc filed a suit against Bard in the New Jersey Superior Court, Union

County, seeking a declaratory judgment that it had no duty to defend or indemnify Bard in

connection with the *Rochester* Action. (*Medmarc Coverage* Action Complaint, Sullivan Dec.,

Ex. S) Bard counterclaimed, seeking coverage for the *Rochester* Action and the *St. Francis*

Action. (Bard Second Amended Answer with Counterclaims in *Medmarc Coverage* Action,

Sullivan Dec., Ex. T)

On March 17, 2008, the trial court in the *Medmarc Coverage* Action granted Bard's

motion for partial summary judgment, ruling that under each of the Medmarc policies in effect

from January 1, 1997 to April 1, 2003, Bard was entitled to "reimbursement of the defense costs

that are reasonably associated with the business disparagement claim and Lanham Act claim, ...

in the underlying [*Rochester* Action]." (Order of March 17, 2008 in the *Medmarc Coverage*

Action, ¶ 2, Sullivan Dec., Ex. E) As a result, the court ordered Bard to "submit to Medmarc

proofs of the costs incurred in the Rochester Action identifying those costs that are reasonably

associated with the defense of the business disparagement and Lanham Act claims...." (*Id.*, ¶ 6)

Pursuant to the March 17, 2008 Order, Bard submitted legal bills to Medmarc. (April 10,

2008 Letter from Jeffrey M. Pollock, Esq. to William M. Savino, Esq., Sullivan Dec., Ex. C) In

the cover letter accompanying the bills,

(*Id.* at

2, 3-5) As a result, Bard stated that

(*Id.* at 6)

REDACTED

(*Id.* at 7)

**D.     BARD'S CONDUCT PRIOR TO APRIL 1, 2003**

In paragraph 28 of the Rochester complaint, Rochester alleged that Bard engaged in a "campaign of pervasive product disparagement intended to mislead the public" that the Rochester catheter "was potentially harmful and ineffective."   (*Rochester* First Amended Complaint, ¶ 28, Sullivan Dec., Ex. J)   Bard's campaign began early.

(Deposition of Anthony

James Conway, Vol. 1, at 35:8 - 35:18 (July 19, 2006), Sullivan Dec., Ex. U)

(CRBARD_000245629, Sullivan Dec., Ex. V) (original in capital letters)

ı follow-up memorandum                                     on

January 28, 1998.  (CRBARD_000245824, Sullivan Dec., Ex. W) `

REDACTED

(*Id.*) (original in capital letters)

(*Id.*)

Mr. Fleischman did not act alone. The Bard campaign was spearheaded at the top of the organization. In a June 16, 1998 memo,

(CRBARD_000363312,

Sullivan Dec., Ex. X) (emphasis added)

(CRBARD_000246806, Sullivan Dec., Ex. Y)

(CRBARD_001097043, Sullivan Dec., Ex. Z)

# REDACTED

In August 1998, Harriette Carr, a Bard Clinical Specialist, published an article in *Infection Control Today* concerning the Rochester catheter which repeated many of the statements in the January 23, 1998 memo from Scott Fleischman. She stated:

(CRBARD_000119403, Sullivan Dec., Ex. AA) (emphasis added)

Deposition of

Harriette A. Carr at 67:16-17 (April 20, 2006), Sullivan Dec., Ex. BB)

REDACTED

....

(CRBARD 001508359, Sullivan Dec., Ex. CC) (emphasis added)

CRBARD_000356625, Sullivan Dec.,

Ex. DD) (emphasis added)

(CRBARD_0003604845, Sullivan Dec., Ex. EE)

In March 2000,

(CRBARD_000116750, Sullivan Dec., Ex. FF)

14

REDACTED

(CRBARD_000116750-51, Sullivan Dec., Ex. FF)

(CRBARD_000116696, Sullivan

Dec., Ex. GG)

In July of 2001,

(CRBARD_000102418,

Sullivan Dec., Ex. HH)

(*Id.* at CRBARD_000102420)

In 2001,

CRBARD_000946814-31, Sullivan Dec., Ex. II)  The AACN is

the largest specialty nursing organization in the world, representing the interests of more than

500,000 nurses who are charged with the responsibility of caring for acutely and critically ill

patients.  *See* About AACN, available at http://www.aacn.org.

---

[4] Catheter-Associated Urinary Tract Infections.

REDACTED

(CRBARD_000946818, Sullivan Dec., Ex. II)

By letter dated April 16, 2002,

(CRBARD 000504808, Sullivan Dec., Ex. JJ)

(*Id.*) (original in bold and underlining)

(CRBARD_000114370 – 71, Sullivan Dec., Ex. KK) (emphasis added)

16

REDACTED

CRBARD 000676484, Sullivan Dec., Ex. LL)

In April 2002,

(CRBARD_000673207, Sullivan Dec., Ex. MM)

_____

(CRBARD_000673172, Sullivan Dec., Ex. NN)

(CRBARD_000673200, Sullivan Dec., Ex. OO)

(*Compare* CRBARD_000673206-07 *with* CRBARD_000115424, Sullivan Dec., Exs. MM and

PP)  The focus of the draft response was consistent with Bard's overall marketing strategy with

respect to Rochester:

REDACTED

… The material supplied by the manufacturer of the nitrofurazone catheter specifically warns about the potential for overgrowth of nonsusceptible organisms (Serratia spp., Proteus spp., and Pseudomonas spp.) including yeasts and fungi. That same material details cautions associated with irritation, sensitization, superinfection, pediatric use, use with pregnant patients/nursing mothers, and other potential adverse reactions. None of those concerns are an issue with the silver and hydrogel coated urinary catheter.

(*Id.* at CRBARD_000673206-07)

During the period Mr. Kelly was Senior Marketing Manager in the Bard Medical Division, he distributed a News Bulletin entitled "The Edge."

(CRBARD_000114998,

Sullivan Dec., Ex. QQ)  The September 30, 2002 issue

(CRBARD_000311358, Sullivan Dec., Ex. RR)

(*Id.* at CRBARD_000311359)

On December 20, 2002,

(CRBARD_000678175-95, Sullivan Dec., Ex. SS)  This Plan identified strategies to be employed for Bard's Medical Division's Infection Control Product lines and a proposed budget for each strategy.

(*Id.*  at

CRBARD_000678187)

(*Id.* at CRBARD_000678189)

In January of 2003,

(CRBARD_000132717, Sullivan Dec.,

REDACTED

Ex. TT)

— 'Do y                                                    (*Id.*)

                                                                    (*Id.* at

included

CRBARD_000132726)

                                                              (*Id.*)

    In February of 2003,

(Deposition of Tim Kelly at 84-85 (March 21, 2006), Sullivan Dec., Ex. UU)

Report of Donald R. House, Ph.D., An Examination of the Impact of Market Barriers: Rochester

Medical Corporation and Urological Catheters, p. 24, Sullivan Dec., Ex. VV)

(*Id.*)

        (*Id.*)

REDACTED

ᵧCRBARD_000275061 – 63, Sullivan

Dec., Ex. WW)

" (CRBARD 000698830 – 31, Sullivan Dec., Ex. XX)

At the direction of Magistrate Judge Arleo, by letter dated June 10, 2009, Bard produced

documents as

June 10, 2009 Letter

from Jack L. Kolpen, Esq. to John Sullivan, Esq., Sullivan Dec., Ex. YY). The materials

identified by Bard do not differ in substance from those published before April 1, 2003.

For example, in August 2003,

ˉRBARD_000245853,

Sullivan Dec., Ex. ZZ)

ᴬˈ

(Compare *Id.* and CRBARD_000275061 -63, Sullivan Dec.,

Ex. WW)

REDACTED

In November 2003,


                                                                          CRBARD

000700975, Sullivan Dec., Ex. AAA)  Once again, Ms. Carr contrasted this catheter with Bard's

silver catheter, which she touted as being "Effective against all organisms" and having "no

re--------" ------ (TJ)


                                              CRBARD_002128302, Sullivan Dec., Ex.

BBB)

                        (*See* CRBARD 000245629, Sullivan Dec., Ex. V)



(CRBARD 001093469)


(CRBARD_000678187, Sullivan Dec., Ex. CCC)

        Bard provided other documents as evidence of alleged disparagement after April 1, 2003,

but these documents simply repeat the same themes outlined in Bard's sales strategy since 1998:

(1) asserting that the Rochester product was harmful or ineffective, (2) misrepresenting that the

active ingredient in Rochester's catheter was an antibiotic, (3) misrepresenting that Rochester's

products could foster the development of super-bugs, (4) falsely comparing the efficacy of the

                                            21

active ingredient in the Bard product to Rochester's Nitrofurazone, and (5) questioning the reliability of studies of the Rochester coating that demonstrated the efficacy of Rochester's product. Given the page limitations of this brief and the repetitiveness of the documents identified by Bard, Liberty Mutual has not addressed every single document identified by Bard, but reserves the right to address such documents if necessary.

## III.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Further, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Finally, in evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

### B.   THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT THAT LIBERTY MUTUAL HAS NO DUTY TO REIMBURSE BARD FOR THE COSTS OF DEFENDING AND SETTLING THE *ROCHESTER* ACTION OR FOR THE COSTS OF DEFENDING THE *ST. FRANCIS* ACTION.

The antitrust claims that were the core claims asserted against Bard in both the *Rochester* and *St. Francis* Actions are not covered because they are not included in the list of offenses in the Liberty Excess Policies' definitions of "advertising injury." In order for coverage to exist under the Liberty Excess Policies, "there must be a causal connection between the advertising and the injury and the injury must fall within one of the four categories defined by the policy."

*See Tradesoft*, 329 N.J. Super. at 152 (citing *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.8 (3d Cir.1999).). As the Appellate division recognized advertising injury coverage "was not reasonably intended by either party to this insurance contract nor reasonably understood by them to offer liability coverage for the entire gamut of business torts simply because after commission of the basic tortious conduct there was a sale or offer to sell." *Id.* As stated above, Bard alleges that it is entitled to coverage for the two antitrust suits on the grounds that they included disparagement claims, which Bard claims trigger Liberty Mutual's coverage obligations. Even if this were correct, there is no coverage for the *Rochester* and *St. Francis* Actions under the Liberty Excess Policies because the prior publication exclusion to bars all coverage to Bard under the Liberty Excess Policies. In this case, there is overwhelming evidence that the alleged disparagement at issue in the *Rochester* and *St. Francis* Actions first took place prior to April 1, 2003. Although Bard claims that its disparagement campaign continued after April 1, 2003, any such later did not contain "substantively different content" and so, the prior publication exclusion applies. *Transportation v. PMA*, 346 F. App'x at 867 (citation omitted).

In *Transportation v PMA*, Transportation sued PMA seeking a share of the costs of defending and indemnifying their mutual insured, G&B Specialties ("G&B") against claims of unfair competition, commercial disparagement and tortious interference with business relationships. *Id.* at 863. Transportation insured G & B from April 24, 1999 to April 24, 2000; PMA insured G&B from April 24, 2000 to April 24, 2001. In the underlying suit against G&B, Pohl Corporation alleged that "[b]eginning in August 1999 and continuing to the [time of filing]," G & B had been "contacting customers and clients of Pohl" and representing that Pohl's products infringed on a patent held by Norfolk Southern Railway Company. *Id.* at 862. PMA claimed that it owed no coverage as a result of its prior publication exclusion, which stated: "

23

[t]his insurance does not apply to ... '[p]ersonal and advertising injury' ... [a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." *Id.* at 863.

The Court began its analysis with the fundamental principle that "the 'first publication' date is a landmark: if the injurious advertisement was 'first published' before the policy coverage began, then coverage for the 'advertising injury' is excluded." *Id.* at 866 (quoting *Applied Bolting Tech. Prods. v. U.S. Fid. & Guar. Co.*, 942 F. Supp. 1029, 1036 (E.D. Pa. 1996), *aff'd*, 118 F.3d 1574 (3d Cir. 1997)). In holding that the prior publication exclusion applied, the Court emphasized that "[t]here is no indication in the complaint that G & B's alleged misrepresentations *changed in substance* between when they were first made and the filing of the complaint." *Id.* (emphasis added). To the contrary, the claim against G&B was that "dating back to August 1999, the publications were *consistently* injurious." *Id.* at 867 (emphasis in original). Importantly, the Court also held that "[u]nless later publications contained 'new matter' – i.e., substantially different content – that the underlying complaint 'allege[d] [were] fresh wrongs,' the 'prior publication exclusion applies." *Id.* at 867 (citation omitted). Under these circumstances, the court held, "G & B's conduct, therefore, falls squarely within the plain language and purpose of the exclusion." *Id.* at 866. *See also Applied Bolting*, 942 F. Supp. at 1036 (insured's contention that the first publication exclusion does not control where the claimant alleges a "continuous tort" is "without merit").

Although the Third Circuit was applying Pennsylvania law, rather than New Jersey law, in *Transportation v PMA*, its approach is fully consistent with New Jersey law. In fact, in *Tradesoft*, the Appellate Division, recognizing that insurance coverage related to advertising injury has not been frequently litigated in New Jersey, relied on *Applied Bolting*, the same case

cited by the Third Circuit in its analysis. *Tradesoft*, 329 N.J. Super. at 142, 147-48.    In

*Tradesoft*, Franklin Mutual Insurance Company ("Franklin") denied coverage to its insured,

Tradesoft, with respect to an action involving claims of patent and trademark infringement,

misappropriation of trade secrets, breach of contract, tortious interference with contract and

unfair competition.    *Id.* at 140. Franklin's policy contained a prior publication exclusion

substantially similar to the Liberty Excess Policies.  The Appellate Division emphasized that, for

the purposes of applying the prior publication exclusion, "it is essential to fix the time *vis-à-vis*

the date of issuance of the policy when the first offending publications took place." *Id.* at 148.

Several other courts have examined the issues addressed briefly in *Tradesoft* and have provided

further guidance as to the application of the prior publication exclusion.  In *Ringler Associates*

*Inc. v. Maryland Casualty Co.*, 96 Cal. Rptr. 2d 136 (Cal. Ct. App. 2000), the California Court of

Appeal, relying on *Applied Bolting*, articulated a test to evaluate the prior publication exclusion

when there are publications which both predate and occur during a policy.  *Id.* at 150-51.  The

Court stated:

> the first-publication exclusion language at issue is intended to and in fact bars
> coverage of an insured's continuous or repeated publication of *substantially the*
> *same* offending material previously published at a point of time before a policy
> incepts, while *not* barring coverage of offensive publications made during the
> policy period which *differ in substance* from those published before
> commencement of coverage.

*Id.* (citations omitted) (emphasis in original).  The court refused to "limit[] the scope of the

exclusion to verbatim replications of the precise same words and phrases" because such an

"interpretation would effectively render the exclusion meaningless."  *Id.* at 150.  The court

stated:

> For this reason, we interpret the language of the Policy exclusion at issue as
> barring coverage of republication of any identifiably defamatory "material"
> whenever the first publication of substantially the same material occurred before

REDACTED

the inception of the policy period, without regard to whether or not the defamatory material is literally restated in precisely the same words.

*Id.*

The complaints filed against Bard in the *Rochester* and *St. Francis* Actions alleged that Bard had engaged in a "campaign of pervasive product disparagement intended to mislead the public and purchasers of the Rochester Release-NF ® Catheter into believing that the Rochester product was potentially harmful and ineffective." (*Rochester* First Amended Complaint, ¶ 28, Sullivan Dec., Ex. J; *St. Francis* Second Amended Complaint, ¶ 45, Sullivan Dec., Ex. M) Rochester identified two specific publications as evidence of the campaign:  the letter dated April 16, 2002 and the August 1998 article written by Harriette A. Carr.  (*Rochester* First Amended Complaint, ¶ 28, Sullivan Dec., Ex. J)  These two documents contained the essential elements of the Bard campaign.

(CRBARD 000504808, Sullivan Dec., Ex. JJ) (original in bold and underlining)

In Ms. Carr's article, she wrote:

REDACTED

(CRBARD_000119403, Sullivan Dec., Ex. AA)

The publications that post-date April 1, 2003 are simply republications.  They do not contain "substantively different content" and so, the prior publication exclusion clearly applies. *Transportation v. PMA*, 346 F. App'x at 867 (citation omitted).  Bard's statements, like those at issue in *Transportation v. PMA* did not "change[] in substance between when they were first made and the [inception of the Liberty Mutual policy]." *Id.* at 866.  To the contrary, the claims against Bard in the *Rochester* and *St. Francis* Actions was that dating back to 1998 when the Food and Drug Administration first approved Release-NF ® for sale, Bard's publications were "*consistently* injurious." *Id.* at 867 (emphasis in original).

For the reasons stated above, there is no genuine issue as to any material fact and Liberty Mutual is entitled to judgment as a matter of law that as a result of the prior publication exclusion, Liberty Mutual has no obligation to reimburse Bard for the amounts it spent to defend and settle the *Rochester* Action or to defend the *St. Francis* Action.

REDACTED

## C.   UNDER PRINCIPLES OF JUDICIAL ESTOPPEL, BARD CANNOT SEEK COVERAGE FROM LIBERTY MUTUAL

Judicial estoppel also applies to bar Bard from recovery as to the *Rochester* and *St. Francis* Actions. The Third Circuit recently stated that "three factors inform a federal court's decision whether to apply [judicial estoppel]: there must be (1) 'irreconcilably inconsistent positions;' (2) 'adopted . . . in bad faith;' and (3) 'a showing that . . . estoppel . . . address[es] the harm . . . and no lesser sanction [is] sufficient." *G.I. Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (quoting *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008)). While its application is discretionary, New Jersey courts apply judicial estoppel so as to "protect the integrity of the judicial system by preventing litigants from playing fast and loose with the court to suit the exigencies of self-interest." *Palcsesz v. Midland Mut. Life Ins. Co.*, 87 F. Supp. 2d 409, 412 (D.N.J. 2000) (citing *Bahrle v. Exxon Corp.*, 279 N.J. Super. 5, 22-23 (App.Div. 1995); *Cummings v. Bahr*, 295 N.J. Super. 374, 387 (App.Div. 1996)).

It is abundantly clear that Bard asserted two fundamentally inconsistent positions with respect to the disparagement alleged in the *Rochester* and *St. Francis* Actions. In the *Medmarc Coverage* Action, Bard took the position, successfully, that Medmarc, which insured Bard from January 1, 1997 through April 1, 2003, was required to reimburse it for the costs associated with defending the business disparagement and Lanham Act claims in both cases. (Order dated March 17, 2008 granting Bard's Motion for Partial Summary Judgment in the *Medmarc Coverage* Action, Sullivan Dec., Ex. E); Order of April 7, 2008, filed in the *Medmarc Coverage* Action, Sullivan Dec., Ex. F) The Medmarc policies, like the Liberty Excess Policies, provided coverage for personal injury and advertising injury "*only* if" the the publication of material that disparaged Rochester "was committed ... *during the policy period*." (Medmarc Policy, Sullivan Declaration ("Sullivan Dec."), Exhibit D) (emphasis added)  Bard ultimately collected

28

REDACTED

from Medmarc.  (Confidential Settlement Agreement and Mutual Release in *Medmarc Coverage* Action, Sullivan Dec., Ex. G)  Having already obtained a ruling that Medmarc was obligated to defend because the alleged disparagement occurred *before* April 1, 2003 and having collected                on that basis, Bard cannot now claim that the first publication took place *after* April 1, 2003.

Here, it is clear that Bard has changed its position with the intent of playing fast and loose with the court and, furthermore, for pecuniary gain. *See Palcsesz*, 87 F. Supp. 2d at 412.  The answer to the question of when the purportedly disparaging statements at issue took place has changed from *before* April 1, 2003 to *after* April 1, 2003 purely for the purpose of Bard's attempt to recover the same defense and indemnity costs, previously recovered from Medmarc, from Liberty Mutual.  In this instance, estoppel is the only appropriate remedy for the potential harm.  For the reasons discussed above, the Court should apply the doctrine of judicial estoppel and grant summary judgment in favor of Liberty Mutual with respect to the defense and indemnity costs related to publications which Bard has successfully argued took place prior to the inception of the Liberty Mutual Excess Policies.

## IV.   CONCLUSION

For all the foregoing reasons, Liberty Mutual respectfully requests that this Court grant summary judgment in its favor and declare as a matter of law that Liberty Mutual has no

obligation to reimburse Bard for the amounts it spent to defend and settle the *Rochester* Action

or to defend the *St. Francis* Action.

Respectfully submitted,

Dated: August 13, 2010

POST & SCHELL, P.C.

By      s/John C. Sullivan
        John C. Sullivan
        Four Penn Center – 13th Floor
        1600 John F. Kennedy Boulevard
        Philadelphia, PA  19103
        Phone:  (215) 587-1000
        Fax:  (215) 587-1444
        E-mail:  jsullivan@postschell.com
        Attorneys for Defendant
        Liberty Mutual Insurance Company